IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

Case No. 09-10057-01-JTM

KAYLENE J. "KATIE" POTTORFF,

    Defendant.

MEMORANDUM AND ORDER

This matter is before the court on the defendant's Motion to Suppress. Pottorff seeks suppression of evidence taken from her house and the statement made while she was in custody.

*A. Custodial Interrogation*

According to Pottorff's motion, when she arrived at the City Building on May 5, 2008 – where she had worked for fifteen years – she was asked to speak with FBI Special Agent Tom Ensz, along with detectives Gallagher and Harrison of the Wichita Police Department (WPD). Ultimately, Pottorff spoke with them for approximately three hours in connection with potential corruption in the bonding industry in Wichita, Kansas. The detectives made an audio recording of this statement.

Although not technically under arrest, Pottorff was taken from her job to the larceny division of the Wichita Police Department on the sixth floor of the City Building. According to Pottorff, at no time was she advised of her *Miranda* rights. At the close of the interview, she was told by her boss, Kay Gales, Director of the Wichita Municipal Court Clerk's Office, that she was being suspended from her job.

According to the defendant's motion, approximately an hour and twenty-five minutes into the interview, Pottorff stated that she did not want to talk anymore. At the cited portion of the transcript, Pottorff states: "Don't make me talk, please don't make me talk." (Tr. 56).

However, it is not apparent that Pottorff requested that all interrogation cease. The comment was made in the context of actual or potential threats of violence against Pottorff by third persons. Shortly before the cited passage, Pottorff was asked if she had been threatened. She responded, "I don't want to tell you who. (crying)." (Id. at 55). The interrogating officer then stated that Pottorff did not have to identify any particular person as the source of the threats, only whether threats had been made:

> [H]ave you been threatened because of the recent crackdown and the, on you and Municipal Court and it makes it more difficult for you to help 'em out? Dos that cause you to be threatened? Now you can give, you can give a conditional yes or no, you can say yes, but I don't want to say by who and that's fine. That'll kind of give you a better picture of things.

(Id. at 56). It was after this request that Pottorff made the "please don't make me talk" request. In context, it appears that Pottorff sought to foreclose questioning about the source of the threats, not that she wished the interview to end.

In her motion to suppress, Pottorff also notes an exchange that occurred at approximately 1 hour and 23 minutes into the interview, in which (again, according to the motion) Pottorff "was

2

asked whether she didn't want to talk with respect to just that subject, which she replies 'no, not ...' *Id*. at 57. Before she could finish her answer, they asked Katie again, 'you just don't want to talk to us anymore?', to which Katie states 'I don't.' Immediately thereafter she answers to further questioning on this point that she meant she doesn't want to talk about the 'fear'." (Dkt. 43, at 2-3).

The recording of the interview demonstrates that after Pottorff indicated that she had accepted "loans" from bailbondsmen, she was asked:

Q2: Out of fear? Have you accepted money out of fear? You know what I mean out of fear?

A: I don't wanna answer that.

Q1: Alright.

A: I don't wanna answer that.

Q1: It's ok to be scared.

A: I can't, I don't want you to...

Q1: Why, what, just, just tell me, why wouldn't you want to answer that? I'm just curious.

(phone ringing, muffled answer)

A: I don't want to talk anymore. I don't...

Q1: OK. Just on that subject?

A: No, not...

Q1: You just don't want to talk to us anymore?

A: I don't ...

Q1: Just on that subject? I'm just trying to clarify why you don't want to talk to us anymore.

3

A: What ... what subject?

Q2: The fear....

Q1: Taking money out of fear.....

A: I...

Q1: Is that what you're not, don't wanna talk about? If you don't want to talk about that we'll just not talk about it.

A: I don't want to talk about the fear part.

An individual is "in custody" under Miranda if he or she is "deprived of his freedom of action in any significant way," *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The court must determine if "a reasonable man in the suspect's position would have understood [the] situation ... as the functional equivalent of formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). This inquiry is fact-intensive, and looks to the totality of the circumstances in the case. *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993).

In *United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008), the court stressed that the "seminal inquiry" is

> "whether a reasonable person in [Lamy's] position would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest." *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007). The standard is an objective one; unlike the due process inquiry, particular characteristics of the defendant are relevant only "to the extent that they may have been known to the officer and influenced his conduct." *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994) (*en banc*) (quotation omitted). In conducting this fact-intensive inquiry, relevant factors include: "(1) whether the circumstances demonstrated a police dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [Lamy] aware that [he] was free to refrain from answering questions, or to otherwise end the interview." *Revels*, 510 F.3d at 1275.

In favor of finding a custodial interrogation, Pottorff points to the length of the interview (totaling three hours), her limited education (she has a high-school equivalency GED), and the fact that it was conducted in the office of one of the detectives.

On the other hand, all of the officers were in plainclothes and there was no other show of authority. No threats were made during the interview.

While the interview was in police offices, the defendant did not have to travel far to get there. Pottorff walked there with the investigating officers, since the defendant also worked in the same building, the same building where she had worked for fifteen years. Accordingly, the level of compulsion is less than if the defendant were transported across town, away from her home or employment. Further, Pottorff never indicated any intent to leave or to stop the questioning. Read in context, the cited portions of the interview indicate only that Pottorff wished to avoid speaking on certain subjects – specifically, the identity of persons who might have threatened her or her family. Far from indicating a desire to terminate the interview, Pottorff remarked at one point, "I trust you. I trust you, I trust you, too. I do." (Tr. 55).

Pottorff was repeatedly told she could terminate the interview. At the beginning of the meeting, Pottorff was told she was not under arrest, that she wasn't going to be arrested, and that she was "free to walk out of here at any time." (Tr. 1.) She was told that the officers wanted to talk about "some of the practices that some of our bondsmen have." (*Id*.). She was then again told that "you don't have to be here and talk to us, I mean, you can say I don't want to talk to you guys, even though you're not under arrest, I just want you to know that, okay?" (*Id*. at 3.) Shortly afterwards, she was told "you can get up and walk out at any time." (*Id*. at 3). Later, she was told "You don't

5

have to cooperate, I would hope that you would." (*Id*. at 15). When Pottorff asked about going to jail, the officers stressed that the investigation would continue, but that she was then free to leave.

> A: Am I gonna go to jail?
>
> Q2: Today, no. Not today.
>
> A: What does that mean?
>
> Q1: Two operative words there, today, no.
>
> Q2: *You're, you're gonna, you're free to leave. You're free to leave. I mean, we're not arresting you.* I don't, I don't want you to think that. But if you do, I mean, we're not, we're not just gonna say, alright, she said it didn't happen so we're not gonna look. I mean, the investigation is going to continue.

*Id*. at 38 (emphasis added). Later, she was told that "nobody here is gonna force you to do anything." (*Id*. at 54). Pottorff was explicitly told that she could "walk out anytime." She responded, "I want to help you." (*Id*. at 94).

The strongest fact in favor of finding a custodial interrogation here is the fact that the conversation was conducted in police offices in the City building. But the Supreme Court has repeatedly concluded that such a fact, while relevant, is not conclusive. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (a non-custodial interrogation "is not converted to one in which *Miranda* applies" simply because the questioning took place at the police station); *California v. Beheler*, 463 U.S. 1121, 1121-22 (1983) (holding uncharged suspect who voluntarily came to the police station for interview and then was allowed to leave was not "in custody" so as to require Miranda protections). *See also United States v. Elzahabi*, 557 F.3d 879 (8th Cir. 2009) (following *Mathiason* and holding that "[w]here there is no clear indication that the defendant's freedom to depart is

6

restricted, a police station interview is non-custodial").[1] As the Tenth Circuit observed in *United States v. Chee*, 514 F.3d 1106, 1114 (2008),

> [a]lthough interviews taking place at the police department are more likely to be "police-dominated," *see United States v. Ollie*, 442 F.3d 1135, 1139 (8th Cir.2006), the mere fact that Mr. Chee was questioned by himself in a nonpublic office at the police department after his wife was asked to remain outside does not transform this interview into a custodial interrogation.

The location of the interview is accordingly a relevant but not conclusive factor; it is not enough by itself to show that the interrogation was custodial. Essentially everything else supports a finding that Pottorff was not in custody. The officers were in plain clothes and there was never any display of weapons or other badges of force or authority. Pottorff was *repeatedly* told she was not under arrest and was free to leave. When Pottorff indicated that she did not want to talk about one subject (threats to her or her family) the officers respected her request. Pottorff repeatedly indicated a willingness to continue the interview. She was specifically told she would not be going to jail that day, although the investigation would continue.

The entire three hour interview was recorded, and the court has reviewed the full interview. Nothing was communicated by the officers in a menacing, threatening, or aggressive manner. The court, taking all of the circumstances of the case into account, finds that the motion to suppress the May 5 statement should be denied.

---

[1] Conversely, an interrogation may be custodial even if it takes place in a suspect's home, since "it is now certain that the mere fact that interrogation takes place in the familiar surroundings of the defendant's home or place of business rather than in the police station does not necessarily mean the defendant is not being subjected to custodial interrogation." *United States v. Phelps*, F.2d 246, 247 (5th Cir 1971) (citing *Orozco v. Texas*, 394 U.S. 324 (1969)), *abrogated on other gds., United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988).

*B. House Search*

Pottorff also seeks suppression of evidence gained by the search, conducted pursuant to warrant, of her house. She contends that the affidavit in support of the warrant lacked probable cause. In this context, she argues (Dkt. 43 at 5-6) that bondsmen frequently acquire property in kind from defendants "much like a pawn shop ... at a greatly reduced price." She then suggests the affidavit in support of the warrant was "rife" with speculation about the use of such property, and complains that "[t]o imply this practice is somehow illegal, especially between people who know each other, simply should not be included in the application for the search warrant in this case." Finally, she notes that

> the affidavit mentions the Wichita Municipal Court Clerk's Office received a letter addressed to Katie Pottorff with a thank you note from bail bondsman Rick Rice for help believed to be in locating a person Rick Rice had bonded. The letter also included a money order with the payee left blank for $225.00. It is possible this was mistakenly included in this letter, or could simply be a "pay down" for a bond Rick Rice was owing to the Wichita Municipal Court Clerk. The affiant speculates it was a gift or bribe to Katie Pottorff. It is uncertain whether affiant was aware at the time of the affidavit of the mental health problems Rick Rice was experiencing then, and continues to experience."

*Id.*

Pottorff supplies no evidence that the letter was a product of Rice's mental problems. More importantly, the Rice letter is only one element in the factual summary presented in the affidavit. In addition, the affidavit notes (1) Pottorff's comments in the May 5 interview, (2) statements made by two former bond recovery agents indicating the existence of the alleged bribery, (3) the results of a preliminary audit showing that Pottorff had suspiciously modified certain records, (4) subsequent audits showing that Pottorff had released large amounts of bonds for certain bailbondsmen, (5) comments made by Pottorff to other witnesses, independent of the May 5 interrogation suggesting

8

that she was knowingly taking valuable property from bailbondsmen, and (6) other facts indicating that Pottorff had received a wide variety of valuable property from bailbondsmen, including automobiles, a computer, a big screen television, and a jet ski.

Further, the defendant's argument misses the point, since it only explains how – hypothetically – certain items in kind might pass sometimes from a defendant to a bailbondsman. It does nothing to explain why such items were then transferred from the bailbondsman to a public employee charged with operating a bail bond monitoring system. And indeed, the affidavit also directly indicates that at least some of the property was not used property, but was bought new (from Sam's Club) by the bailbondsmen and then given to Pottorff, supposedly as "housewarming gifts." Pottorff's knowledge that the acquisition of the property was not innocent is reflected in her comments to others that the property "fell of the truck." (Aff. at ¶ 22).

Taken as a whole the affidavit supplies probable cause to believe that Pottorff was engaged in criminal activity and that evidence of that activity might be found in the house to be searched.

IT IS ACCORDINGLY ORDERED this 30th day of June, that the defendant's Motion to Suppress (Dkt. 43) is hereby denied.

                                                               s/ J. Thomas Marten
                                                               J. THOMAS MARTEN, JUDGE